# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

GREAT AMERICAN INSURANCE COMPANY )
OF NEW YORK, )
)
   Plaintiff, )
)  No. 19 C 3831
   v. )
)
MALLERS BUILDING, L.L.C., and )  Judge Thomas M. Durkin
SPECTRUM PROPERTIES GROUP, INC., )
)
   Defendants. )

## MEMORANDUM OPINION AND ORDER

This action concerns insurance claims made to Great American Insurance Company of New York ("Great American") following a 2018 fire at the high-rise building located at 5 South Wabash Street in Chicago, commonly known as the Jeweler's Center ("Mallers Building"). The building is owned by Mallers Building, LLC and operated by Spectrum Properties Group, Inc. (together, "Mallers"). Before the Court are five motions for partial summary judgment: (1) Mallers' motion regarding the interpretation of the relevant insurance policy as related to the expenses Mallers incurred to reconstruct floors 2-4 of the Mallers Building within 120 days versus six months, R. 72 ("Mallers' Expediting Expense Motion"); (2) Mallers' motion regarding its affirmative defenses of estoppel and waiver as to certain claims for coverage, R. 69 ("Mallers' Estoppel Motion"); (3) Great American's motion regarding the interpretation of the insurance policy as to certain claims that are the subject of Mallers' Estoppel Motion, R. 89 ("Great American's Policy-Based Cross

Motion"); (4) Great American's motion regarding code or ordinance-related issues, R. 80 ("Great American's Code-Related Motion"); and (5) Mallers' cross motion regarding some of the same code or ordinance-related issues, R. 101 ("Mallers' Code-Related Cross Motion"). For the following reasons, Mallers' Expediting Expense Motion is granted, Mallers' Estoppel Motion is denied, Great American's Policy-Based Cross Motion is granted, Great American's Code-Related Motion is granted in part and denied in part, and Mallers' Code-Related Cross Motion is denied.

## STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Four of the five motions at issue concern the interpretation of the insurance policy issued by Great American to Mallers, which was in effect at the time of the fire.

"Under Illinois law, the interpretation of an insurance policy is a question of law that is properly decided by way of summary judgment." *BASF AG v. Great Am. Assur. Co.*, 522 F.3d 813, 818-19 (7th Cir. 2008) (citing *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 620 N.E.2d 1073, 1077 (Ill. 1993)) (other citations omitted). "A court's primary objective in construing the language of an insurance policy is to ascertain and give effect to the intentions of the parties as expressed by the language of the policy." *Valley Forge Ins. Co. v. Swiderski Elec., Inc.*, 860 N.E.2d 307, 314 (Ill. 2006) (citing *Crum & Forster*, 620 N.E.2d at 1078). Like any other contract, insurance policies are construed as a whole, "giving effect to every provision, if possible, because it must be assumed that every provision was intended to serve a purpose." *Valley Forge*, 860 N.E.2d at 314 (citing *Central Ill. Light Co. v. Home Ins. Co.*, 821 N.E.2d 206, 213 (Ill. 2004)). In construing an insurance policy in particular, the court also should consider "the type of insurance for which the parties have contracted, the risks undertaken and purchased, the subject matter that is insured and the purposes of the entire contract." *Crum & Forster*, 620 N.E.2d at 1078. If the words in the insurance policy, "given their plain and ordinary meaning, are unambiguous, they must be applied as written." *Valley Forge*, 860 N.E.2d at 314. However, ambiguous terms "will be strictly construed against the insurer, who drafted the policy, and liberally in favor of coverage." *Nicor, Inc. v. Assoc. Elec. & Gas Ins. Servs. Ltd.*, 860 N.E.2d 280, 286 (Ill. 2006).

# BACKGROUND

This action arose in the wake of an April 25, 2018 three-alarm fire that caused severe damage to floors 2 through 4 of the Mallers Building (among other areas) and rendered the leased spaces of 28 jewelers untenantable. The Mallers Building was insured by a Property and Inland Marine Insurance Policy through Great American at the time of the fire (the "Policy"). Mallers submitted a claim under the Policy the same day as the fire. Mallers Building manager Scott Solotorovsky worked with Great American in-house adjuster Sam Talarico and independent adjuster Ray Pawlak on the claim until May 17, 2018, when Great American in-house adjuster Daniel T. Moore and independent adjuster Jim Buckley replaced them.

The parties disagreed about certain coverage issues during the claim adjustment process, and Great American ultimately filed this lawsuit for declaratory and other relief as a result. Mallers then filed a counterclaim regarding Great American's refusal to cover certain costs. The parties have since settled various issues and claims. But the following remain in dispute for purposes of the operative complaint and are relevant to the motions here: (1) Count I, seeking a declaration that there is no coverage for the so-called expediting costs associated with the reconstruction of floors 2-4; and (2) Count III, seeking a declaration of Great American's rights with respect to claims that concern the Policy's ordinance or law coverage. R. 33.

In turn, Mallers' counterclaim includes the following counts: (1) Count I, seeking a declaratory judgment for payment of certain losses and costs under the

Policy; and (2) Count II for breach of contract for failing to pay such losses and costs under the Policy.[1] R. 9. The pending summary judgment motions implicate these counts with respect to: the so-called expediting expenses; rent abatement; certain costs associated with a new central air conditioning system; certain other costs Mallers contends were treated improperly under the Policy's ordinance or law coverage; costs related to damaged flooring; and costs related to damaged basement property. The Court addresses additional background facts as relevant in the context of each of the summary judgment motions below.

## ANALYSIS

### I.    Mallers' Expediting Expense Motion

At the heart of this case is a debate involving $2.8 million in costs Mallers paid to Clune Construction Company to complete the reconstruction of the displaced tenants' damaged spaces on floors 2-4 within 120 days of the fire versus six months.[2] Two of the pending summary judgment motions concern those costs. The first is Mallers' Expediting Expense Motion, which seeks summary judgment on Count I of

---

[1] Mallers' counterclaim also includes a third count, alleging that Great American engaged in bad faith by waiting until money was spent or committed before denying coverage on "weak or meritless" grounds. R. 9. Neither party seeks summary judgment on this claim, so the Court does not address it further here.

[2] Initially, Great American denied approximately $4.8 million charged by Clune as expediting costs. Mallers thereafter demanded an appraisal regarding the amount of such costs, and the appraisal panel concluded that the actual amount attributable to expediting reconstruction was just $2.8 million. Great American thereafter paid the $2 million difference as costs incurred as part of a "normal" reconstruction schedule subject to the Building limit (which is the maximum amount Great American would pay to rebuild or replace the Mallers Building). The remaining $2.8 million are at issue here.

Great American's operative complaint and Counts I and II of Mallers' counterclaim as to liability based on Mallers' interpretation of the Policy. In sum, Mallers contends that the so-called expediting expenses are not expediting at all. Rather, they represent the commercially reasonable costs of repairing and replacing the damaged areas within the timeframe required by Mallers' leases with the tenants displaced by the fire, and sanctioned by the Policy's timing requirements. Accordingly, Mallers contends that such costs fall under the Building limit of insurance, for which there is more than enough limits remaining to cover all such costs, and that not only did Great American know this, but also it blessed reconstruction on the very timeline it now disputes.

Great American disagrees, arguing that coverage for such costs (if any) exists not under the Building limit, but rather under the Policy's Business Income and Extra Expense Coverage Form, which has a significantly lower sublimit. Great American continues that of that sublimit—because Great American paid for the construction of temporary "swing spaces" for displaced tenants' use before and during reconstruction and toward rental income losses—just over $2 million in limits remain. And Great American contends that of that approximately $2 million, at most only a small fraction is recoverable. The Court addresses the relevant Policy language and additional background facts before addressing these arguments.

## A.    Background

***Policy.*** The Policy provides coverage on a replacement cost basis subject to the following relevant limits: (1) Building - $80,238,264; and (2) Business Income and Extra Expense - $6,815,736. R. 9-1 at 28.

The applicable valuation provision states in pertinent part:

> If replacement cost is indicated . . . as the method of valuation we will determine the value of Covered Property in the event of loss or damages as follows: (i) We will not pay on a replacement cost basis for any loss or damage: . . . (2) unless the repairs or replacement are made *as soon as reasonably possible after the loss or damage.*

*Id.* at 40-41 (emphasis added).

The Policy's "Duties in the Event of Loss or Damages" provision also obligates Mallers to act swiftly after a loss, stating:

> 1. You must see that the following are done in the event of loss or damage to Covered Property:
> . . .
> (i) If you intend to continue your business, *you must resume all or part of your "operations" as quickly as possible.*

*Id.* at 36-37 (emphasis added). "Operations" are defined in relevant part as "your business activities occurring at the described location." *Id.* at 42. In turn, the Policy's "Resumption of Operations" clause states (among other things):

> 2. *If you do not resume "operations," or do not resume "operations" as quickly as possible*, we will pay losses based on the length of time it would have taken to resume operations as quickly as possible.

*Id.* at 38 (emphasis added).

Separately, the Policy's Business Income and Extra Expense Coverage Form "Extra Expense" provision states in relevant part ("Extra Expense provision"):

b. Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss.

We will pay Extra Expense (other than the expense to repair or replace property) to:

(1) Avoid or minimize the "suspension" of business and to continue "operations" at the described locations or at replacement locations or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location.

(2) Minimize the "suspension" of business if you cannot continue "operations."

We will also pay Extra Expense to repair or replace property, but only to the extent it reduces the amount of loss that otherwise would have been payable under this Coverage Form.

*Id.* at 69. The Policy defines "Period of Restoration" as that which:

a. begins immediately after the time of direct physical loss or damage for Business Income or Extra Expense Coverage caused by or resulting from any Covered Cause of Loss at the described location; and

b. ends on the earlier of:

(1) the date when the property at the described location should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

(2) the date when business is resumed at a new permanent location.

*Id.* at 42.

**Post-fire mitigation and claim adjustment.** Mallers Building manager Scott Solotorovsky testified that he advised Great American's independent adjuster Ray Pawlak at a meeting the day after the fire: that "28 or so tenants" were "going to be displaced for some time;" of the "nature of the tenancy of the building," with over 150 jewelers who "work together" and "whose fortunes are tied to one another;" and that "an indefinite displacement poses a very real risk" to the Mallers Building and its tenants because if the displaced tenants went out of business, it was "highly

like[ly]" that nondisplaced tenants would also go out of business due to the "interconnectedness of the tenancy." R. 74 ¶ 21; R. 94 ¶ 21. Solotorosvky testified further that he advised Pawlak that there were vacant spaces throughout floors 5 through 21 (such spaces, the "swing spaces,") and proposed placing the displaced tenants in those spaces after "causing them to be in an occupiable condition" so the tenants could "do something better than being on the street." *Id.* Pawlak indicated that swing space construction seemed like a good idea but asked for more details. *Id.*

Four days later on April 30, 2018, and after first attending a larger group meeting, Solotorovsky again met with Pawlak along with Mallers' outside counsel, Chad Richman, and Elliott Ritter of Quantum Global Advisors, LLC ("Quantum"), a professional consulting firm Mallers engaged as its claim preparer. R. 74 ¶ 22; R. 94 ¶ 22. The parties dispute what transpired at that meeting.

Solotorovsky testified that he reiterated what he had previously said about "the nature of the tenancy" and the need to "prop up" the displaced tenants and "get them in some sort of working capacity as quickly as possible." R. 74 ¶ 23. He identified specific swing spaces for particular tenants, provided an estimate for the cost of their construction, and gave the name of a general contractor. *Id.* According to Solotorovsky, he also reviewed Section 13 of Mallers' tenant leases with Pawlak. *Id.* That section gave Mallers two options following a fire, and provides:

> If the premises or the Building are made untentantable by fire or other casualty, the Lessor may elect (a) to terminate this lease as of the date of the fire or casualty by notice to the Lessee within thirty (30) days after that date or (b) to repair, restore or rehabilitate the Building or the premises at the Lessor's expense within one hundred twenty (120) days after the Lessor is enabled to take possession of the injured premises

and undertake reconstruction or repairs, in which latter event the lease shall not terminate but rent shall be abated on a per diem basis while the Premises are untentantable. If the Lessor elects so to repair, restore or rehabilitate the Building or the premises and does not substantially complete the work within the one hundred twenty (120) day period, either party can terminate this lease as of the date of the fire or casualty by notice to the other party not later than one hundred thirty (130) days after the Lessor is enabled to take possession of the injured premises and undertake reconstruction or repairs.

R. 74 ¶ 10; R. 94 ¶ 10. Solotorovsky stated that he explained to Pawlak at the April 30 meeting that Mallers desired to (1) proceed under option (b) of Section 13 by restoring the displaced tenants' spaces within 120 days after Mallers was able to take possession of them, and (2) "provide the swing spaces" to the displaced tenants until their spaces on Floors 2 through 4 were restored (the "Two-Part Plan"). And he represented that Pawlak agreed with this plan. R. 74 ¶¶ 23-24.

Ritter and Richman attested similarly about the April 30 meeting. Specifically, Ritter attested that Pawlak "was made aware" at that meeting of Mallers' decision to "elect to proceed under option (b)" of Section 13 by restoring floors 2-4 within 120 days, and that Pawlak "did not express any reservations or concerns." Ritter also explained his understanding that Pawlak had the authority to "provide authorization to [Mallers] to move forward" with the plan, and that Pawlak "never indicated that he needed . . . approval from Great American before authorizing" it. R. 112-1 ¶¶ 4, 6. Likewise, Richman attested to his "perception from [Pawlak's] words, actions, and manner" at the April 30 meeting that Pawlak "had the ability to reach agreements on behalf of Great American and authorize Mallers' [Two-Part P]lan;" that there was "no question" after the meeting that "Mallers had Great American's authorization to

proceed;" and that Pawlak "appreciated the urgency of the situation and wanted Mallers to initiate" the Two-Part Plan immediately. R. 112-2 ¶¶ 3, 8, 10. Mallers thereafter sent letters to the affected tenants based on that understanding, stating in relevant part:

> We have elected to repair, restore, and rehabilitate your premises and the Building as soon as we are enabled to take possession of your premises and undertake reconstruction or repairs. Rent shall abate during such repair, restoration or rehabilitation of your premises.
>
> In addition, you will be provided temporary space . . . as soon as possible until the restoration of your premises is substantially complete and returned to you. We will be providing more information on how soon this space will be available as soon as we have more details.

*Id.* ¶ 11; R. 74 ¶ 26; R. 94 ¶ 26.

But while Great American did reimburse Mallers for the swing space construction costs,[3] it disputes that Pawlak agreed to the second part of the Two-Part Plan; that is, to cover the expenses necessary to reconstruct floors 2-4 within 120 days. Great American points to the lack of documentary evidence of any such agreement and offers among other things Pawlak's affidavit in which he represents that Solotorovsky "did not seek or obtain [Pawlak's] approval for his decisions, nor did he inform [Pawlak] that his decision-making process somehow hinged upon [Pawlak's] approval." R. 93-1 ¶ 14. Pawlak further attested that in fact "Mallers had already made its decision to rebuild the damaged spaces and relocate affected tenants" as of April 26, and Solotorovsky "did not present [Pawlak] with any specific deadline as to when reconstruction had to be completed, much less seek [Pawlak's]

---

[3] Great American reimbursed Mallers for over $4.8 million in swing space construction costs.

authorization or approval to meet this unspecified deadline at Great American's expense." *Id.* ¶¶ 12, 15. Pawlak also disputed that he had the authority to approve the Two-Part Plan, testifying that he makes clear to "[a]ll vendors that [he] come[s] across" that he is an independent adjuster, not the insurance company, and as such his role is "simply [to] report" because "[o]nly the insurance company can authorize." R. 74-8 at 136, 223.

As discussed, Great American in-house adjuster Daniel Moore and independent adjuster Jim Buckley replaced Pawlak and Talarico as Great American's representatives on Mallers' claim on May 17, 2018. R. 74 ¶ 14; R. 94 ¶ 14. At a meeting with Mallers the next day, Moore discussed Section 13 and the 120-day reconstruction timeline. R. 74 ¶¶ 34-35; R. 94 ¶¶ 34-35. But according to Moore, at that time Mallers was still "figuring out what [the 120-day lease provision] meant and what they needed to do, if anything," about it. R. 74-2 at 182.

Nevertheless, the record reflects that Buckley emailed Solotorovsky on June 1 to indicate that Mallers' general contractor Clune could begin demolition of floors 2-4 on a time and materials basis, R. 74 ¶ 47; R. 94 ¶ 47, and in and around that same time, the displaced tenants signed acknowledgements referencing among other things that Mallers had taken possession of their properties for purposes of starting Section 13's 120-day clock, R. 74 ¶ 36; R. 94 ¶ 36. Clune then mobilized its subcontractors and started the demolition work on June 11. R. 74 ¶¶ 47, 54; R. 94 ¶¶ 47, 54. Clune completed demolition in early July before turning to restoration. R. 74 ¶¶ 54-55; R. 94 ¶¶ 54-55.

Clune and Great American's construction consultant, Miner & East, initially sought to agree to a fixed price for the reconstruction work. R. 74 ¶¶ 54, 59; R. 94 ¶¶ 54, 59. But wildly divergent cost estimates caused them to create "buckets" for various costs and review them more closely. One such "bucket" was for "expediting expenses," about which Great American's concern was growing. R. 74 ¶¶ 60-62; R. 94 ¶¶ 60-62. At one point, Clune threatened to stop work on the project because a price had yet to be set. R. 74 ¶ 55; R. 94 ¶ 55. But Clune ultimately continued the restoration work, which was largely complete as of August 6. R. 74 ¶¶ 55-56; R. 94 ¶¶ 55-56. That same day, Moore formally reserved Great American's rights with respect to the so-called expediting expenses. R. 74 ¶¶ 56, 69; R. 94 ¶¶ 56, 69. In so doing, Moore explained to Solotorovsky that Great American disagreed with Mallers' interpretation of Section 13, stating that the need to expedite reconstruction should have been mitigated by the construction of the swing spaces, and that expecting Great American to also pay the expediting costs, "especially given the amounts involved," was beyond "logic and reason." R. 74 ¶ 69; R. 94 ¶ 69.

Meanwhile, the displaced tenants were able to move into their swing spaces beginning that June, with the final tenant moving in on July 5. R. 74 ¶ 37; R. 94 ¶ 37. Thereafter, and following all inspections of the tenants' original spaces, the tenants began moving back into those spaces in September.[4] R. 74 ¶¶ 38, 56; R. 94 ¶¶ 38, 56. In so doing, each of them signed a "Possession Agreement," in which it

---

[4] While most tenants moved back into their original spaces in September 2018, reconstruction of the suite in which the fire started was not complete until later, and the affected tenant did not obtain possession until December 2018 as a result.

agreed (among other things) that its space had been "fully repaired, restored and rehabilitated within the applicable time period allowed under the Lease." *Id.*

However, the parties' discussion regarding coverage for the so-called "expediting expenses" continued. In a December 10, 2018 letter to Mallers, Moore pointed to Section 23 of the tenants' leases to argue for the first time that "there was no need to expedite repairs" of floors 2-4 because the tenants "were moved . . . to suitable [swing] spaces elsewhere in the building," thereby "contractually prevent[ing]" the tenants "from terminating their leases." R. 74 ¶ 72; R. 94 ¶ 72. Section 23 provides in relevant part:

> Lessor shall have the right, upon thirty (30) days prior notice, to relocate Lessee to another location in the Building at no expense to Lessee and upon the condition that the new location designated by Lessor shall be substantially as desirable as the Premises with respect to layout and location in the Building and shall not be smaller in area than the premises.

R. 74 ¶ 11; R. 94 ¶ 11. Mallers disagreed in letter responses dated January and February 2019, arguing that Great American's position was both "belated and defective," because the "120-day restoration period in Section 13 specifically governs the process for a casualty under the leases," and "the specific always controls over the general," and that Great American understood "as a sophisticated underwriter" that it was "insuring [Mallers'] obligations under the leases as part of its coverage." R. 74 ¶¶ 73-74; R. 94 ¶¶ 73-74.

In the face of this ongoing debate, Great American filed this action seeking a declaration that these so-called "expediting expenses" are not covered by the Policy.

## B.    Analysis of Expediting Expense Motion

The parties spend much of their briefs attempting to frame the facts favorably to their respective positions on whether an agreement was reached between them regarding the costs incurred to complete reconstruction of floors 2-4 within 120 days. But because the Expediting Expense Motion seeks an interpretation of the Policy, the first question is whether the Policy itself is ambiguous as it relates to those expenses. Indeed, only if it is may the Court consider that (and any other) extrinsic evidence.[5]

Whether a contract is ambiguous is a question of law for the court. *Curia v. Nelson*, 587 F.3d 824, 829 (7th Cir. 2009). "Words are ambiguous if they are reasonably susceptible to more than one interpretation, not simply if the parties can suggest creative possibilities for their meaning, and a court will not search for ambiguity where there is none." *Valley Forge*, 860 N.E.2d at 314 (internal citations omitted). Further, close questions regarding coverage "are generally to be decided against the insurer," because "[a]s the party drafting the policy in the majority of cases, the insurer bears the burden of errors it might contain." *United Nat'l Ins. Co. v. Fasteel, Inc.*, 550 F. Supp. 2d 814, 821 (N.D. Ill. 2008) (citing *Johnson v. Equitable Life Assur. Soc. of U.S.,* 275 F.2d 315, 318 (7th Cir. 1960)); *Fox v. Admiral Ins. Co.*, 2016 WL 454319, at *4 (N.D. Ill. Feb. 5, 2016) ("Illinois law strictly construes ambiguities against an insurer, even when the insured is a large and sophisticated

---

[5] Extrinsic evidence includes evidence regarding the position of the parties, the surrounding circumstances existing at the time of execution, and the parties' subsequent conduct. *Harris Tr. & Sav. Bank v. LaSalle Nat. Bank*, 567 N.E.2d 408, 412 (Ill. App. Ct. 1990).

entity") (citing *Farmers Auto. Ins. Ass'n v. St. Paul Mercury Ins. Co.*, 482 F.3d 976, 978 (7th Cir. 2007)). If a court concludes that an insurance policy is ambiguous but after weighing extrinsic evidence is "still faced with ambiguity, the contract must be construed in [the insured's] favor for purposes of any further proceedings." *See Newman v. Metro. Life Ins. Co.*, 885 F.3d 992, 999-1000 (7th Cir. 2018).

As stated, Mallers contends that the Policy covers the costs to complete reconstruction within 120 days under the Building limit. In support, Mallers points to the Policy language cited above directing Mallers to resume operations "as quickly as possible" and "as soon as reasonably possible" or risk losing some level of coverage. Notably, the Policy does not define either quoted phrase. But Mallers argues that the Court should consider the 120-day reconstruction timeline set forth in Section 13 of its tenant leases in construing them, and that doing so means the so-called expediting expenses are simply the "ordinary reasonable costs of restoration under the Building coverage form – not 'extra' at all." R. 73 at 13.

The Court agrees that this a reasonable interpretation. Despite Great American's contention that the leases are "irrelevant" and that its obligations are defined solely by the Policy, R. 92 at 15, it is axiomatic that "[a]n insurance policy is not to be interpreted in a factual vacuum; it is issued under given factual circumstances." *Glidden v. Farmers Auto. Ins. Ass'n*, 312 N.E.2d 247, 250 (Ill. 1974). And the Court is duty-bound to construe the Policy "with due regard to the risk undertaken [and] the subject matter that is insured." *Outboard Marine Corp. v. Liberty Mutual Ins. Co.*, 607 N.E.2d 1204, 1215 (Ill. 1992); *see also Am. States Ins.*

*Co. v. Koloms*, 666 N.E.2d 699, 702 (Ill. App. Ct. 1996) ("We do not . . . interpret terms in a factual vacuum, but instead view them in the context in which they appear and with due regard to the factual setting surrounding the issuance of the insurance policy."). It is undisputed that the tenant leases were in place at the time of the fire and for the entire period in which the Policy was effective. Accordingly, they were part of that risk and subject matter. Further, the Court notes that Great American's sincerity in arguing that the leases are irrelevant is belied by Great American's own reliance on Section 23 of the same leases as a basis for denying coverage. And because there can be no contention that the swing spaces were "substantially as desirable . . . with respect to layout and location" as the tenants' permanent spaces on the lower, street-visible floors, that section is plainly inapplicable here in any case.[6]

Nevertheless, Great American urges the Court to look elsewhere for the answers, pointing to the Business Income and Extra Expense Coverage Form's "Extra Expense" provision cited above, which it contends unambiguously covers expediting reconstruction expenses and permits their recovery "*only* if [such] extra costs serve to reduce Mallers' overall claim amount." R. 92 at 10 (emphasis in original). Great American argues that the construction of swing spaces obviated the need to reconstruct floors 2-4 quickly because the swing spaces alone allowed Mallers to retain its displaced tenants, meaning the associated expediting costs are not

---

[6] Moreover, the record suggests that Great American anticipated an even shorter reconstruction timeline under the same circumstances. Indeed, Great American noted just two years earlier in an internal survey regarding the Mallers Building that "[i]f floors closed due to fire, it would take approximately 2-3 months to rebuild." R. 74 ¶ 79; R. 94 ¶ 79.

recoverable as an Extra Expense. Great American further contends that even if the Court concludes otherwise, Mallers' recovery should be capped at $131,593.64 of the $2.8 million that remains at issue—or two months' lost rent for the displaced tenants at $65,796.82 per month.

These arguments are not convincing. First, Great American's agreement to cover swing spaces has no bearing on whether it also has a contractual obligation to pay for reconstruction on the timeline Mallers contends applies here. Second, Great American's argument assumes that reconstruction costs to comply with a 120-day timeline are unambiguously an "Extra Expense." But that is far from clear, even assuming the costs at issue can be considered "expediting," and not simply "ordinary reasonable costs of restoration" as Mallers argues.

Indeed, the Extra Expense provision does not explicitly refer to accelerated or expedited reconstruction. And importantly, the Policy *does* specifically address "expediting expenses" in a separate coverage form that is not relevant here, suggesting that Great American knew how to provide differently for treatment of such expenses if it intended to. *See* R. 9-1 at 134 (Equipment Breakdown Coverage Form, addressing "Expediting Expenses," and stating that Great American would pay the "reasonable extra cost" to both "make temporary repairs" and "expedite permanent repairs or permanent replacement").

Moreover, the two cases Great American cites for the proposition that "project acceleration is different than 'reasonable speed'" and acceleration costs are compensable "*only* if they served to reduce or mitigate the overall insured loss" are

readily distinguished, because the policies in both cases contained separate, explicit, and limited coverage for expediting repairs. R. 92 at 10-12 (emphasis in original) (citing *Indianapolis Airport Auth. v. Travelers Prop. Cas. Co. of Am.*, 849 F.3d 355, 361-62 (7th Cir. 2017) (affirming district court's conclusion that "costs for accelerating different construction tasks" were not included under general coverage provision in part because such costs were explicitly provided for elsewhere in policy) and *One Place Condo., LLC v. Travelers Prop. Cas. Co. of Am.*, 2015 WL 2226202, at *5, *8 (N.D. Ill. Apr. 22, 2015) (costs for accelerating reconstruction were explicitly addressed under "Additional Coverages" and therefore subject to that coverage's limit, not general policy limit)); *see also Oceanside Pier View, L.P. v. Travelers Prop. Cas. Co. of Am.*, 2008 WL 7822214, at *8-9 (S.D. Cal. May 6, 2008) (policy unambiguously provided for expediting costs as an additional coverage subject to a $100,000 limit, not under its general coverage, and to hold otherwise would render "expediting costs" portion of additional coverage meaningless). In contrast and as stated, the Policy does not.

Nor would Mallers' interpretation render the "Extra Expense" provision meaningless, as Great American contends. R. 92 at 11. Mallers offers *Seward Park Housing Corporation v. Greater New York Mutual Insurance Company* as one example of expenses that were deemed "extra" for purposes of a provision like the Extra Expense provision here; specifically, a line of credit that "allowed the plaintiff

to rebuild the [damaged property] and resume receiving rental income."[7] R. 73 at 16 and R. 116 at 8 (citing *Seward Park*, 43 A.D.3d 23, 25-26 (N.Y. Sup. Ct. 2007)). Notably, Great American failed to meaningfully address the case. *See* R. 92 at 14 (stating that *Seward* "is of very little, if any, insight," but not explaining why). And as discussed, Great American also paid the swing space construction costs as an "Extra Expense."

Next, Great American argues that Mallers' interpretation would require it to "provide[ ] a blank check to accelerate repair or replacement" on a "24/7" basis, without regard for whether it "save[s] the insurer money." R. 92 at 8-10. Great American cites generally to cases outside of the Seventh Circuit for the proposition that resumption of operations and period of restoration clauses like those in the Policy and set forth above are intended to be "*mitigation* of damages" provisions or "limitation[s] on coverage," not "*aggravation* of damages" provisions or "grant[s] of coverage." And Great American argues that holding otherwise would further an absurd result. *Id.* at 9-10. That is, because the millions of dollars spent to expedite reconstruction paled in comparison to what Great American contends at most was a little over $130,000 savings in rental income.

But as explained, Mallers does not seek coverage for "24/7" work. Instead and as stated, Mallers' position is that the meaning of the (undefined) phrases "as quickly as possible" and "as soon as reasonably possible" is shaped by Mallers' obligation

---

[7] The plaintiff's brief in *Seward Park* quotes the relevant policy language, which is substantially similar to the Extra Expense provision at issue here. *See Seward Park,* Pl.'s Brief, 2006 WL 4584163, at *69-70.

under the leases to reconstruct damaged areas within 120 days. And Mallers fervently disagrees with Great American's "savings" analysis in any case, offering expert testimony to support its argument that given the interconnectedness of its tenants' businesses, the amount Mallers stood to lose if the displaced tenants terminated their leases was approximately $5.3 million—the lost rental income from more than 150 tenants over a period of approximately 12 months. If that is true, the 120-day reconstruction timeline was most certainly a mitigating measure.

Finally, the Court notes that while the parties spent significant energy framing the facts favorably to their respective positions on Great American's agreement (or lack thereof) to Mallers' Two-Part Plan, they exerted very little effort explaining how those facts affect the analysis of this summary judgment motion. But no matter, because even considering the testimony and other evidence in interpreting the parties' intent with respect to the Policy—as is clear from the detail provided above— factual disputes, and thus unresolved ambiguity, remain.[8] And ambiguity as to Policy

_____

[8] Notably, Mallers separately moved to strike Pawlak's affidavit indicating that he did not agree to the Two-Part Plan on the basis that it conflicts with his prior deposition testimony and therefore should be barred under the "sham affidavit" rule. More specifically, Mallers argues that Pawlak's affidavit provides much more detail regarding his April 2018 meetings with Solotorovsky than he offered during his deposition, despite that he was shown the same documents during his deposition that he indicates he relied upon for purposes of his affidavit. R. 110. Ordinarily, to determine whether a contradictory statement in an affidavit is a "sham," courts "examine the particular circumstances of a change in testimony to see whether it is plainly incredible or merely creates a credibility issue for the jury." *Patton v. MFS/Sun Life Fin. Distribs., Inc.*, 480 F.3d 478, 488 (7th Cir. 2007). Indeed, an affidavit may be disregarded only "when the statements are 'inherently inconsistent'" and the discrepancies are "incredible and unexplained." *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 751 (7th Cir. 2010) (quoting *Commercial Underwriters*, 259 F.3d at 799). If the change is "plausible and the party offers a suitable explanation such as

language must be resolved in Mallers' favor. *See Newman*, 885 F.3d at 999-1000 (if an insurance policy remains ambiguous after weighing extrinsic evidence, it "must be construed in [the insured's] favor for purposes of any further proceedings").

In short, the insurer bears the burden of proving that a loss is limited or excluded. *See Addison Ins. Co. v. Fay*, 905 N.E.2d 747, 752 (Ill. 2009); *Stoneridge Dev. Co. v. Essex Ins. Co.,* 888 N.E.2d 633, 650 (Ill. App. Ct. 2008); *One Place*, 2015 WL 2226202 at *3. And "[a] policy provision that 'purports to exclude or limit coverage will be read narrowly" and applied "only where its terms are clear, definite, and specific."' *Crackel v. State Farm Ins. Co.*, 16 N.E.3d 409, 413-14 (Ill. App. Ct. 2014) (quoting *Gillen v. State Farm Mut. Auto. Ins. Co.,* 830 N.E.2d 575, 582 (Ill. 2005)). The Extra Expense provision is not, and Great American has not met its burden to prove otherwise.

*     *     *     *     *

---

confusion, mistake, or lapse in memory, a change in testimony affects only its credibility, not its admissibility." *Id.* (citing *Commercial Underwriters*, 259 F.3d at 799). District courts are directed to "make [a sham] determination 'with caution,' as credibility and weight are generally issues of fact for the jury." *Gavin/Solmonese LLC v. Kunkel*, 2019 WL 1125792, at *1 (N.D. Ill. Mar. 12, 2019) (quoting *Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 638 (7th Cir. 2004)). As discussed in Section II(B) below, the Court concludes that Pawlak made no representations in his affidavit that were "inherently inconsistent" with his deposition testimony. But the resolution of Mallers' motion to strike has no bearing on the outcome of the Court's ruling regarding Policy coverage for the so-called expediting expenses. Indeed, even if the Court considers Pawlak's affidavit, weighing it against Mallers' evidence of an agreement at best reflects a question of fact and ongoing ambiguity about the parties' intent. Mallers' motion to strike Pawlak's affidavit on the issue is therefore denied as moot.

The Court agrees with Mallers that a reasonable interpretation of the Policy is that restoration within 120 days was "consistent with and sanctioned by" the Policy's timing requirements. Even assuming Great American's interpretation also is reasonable, which the Court believes is not, the Policy must be construed in Mallers' favor and against Great American. *See Crackel*, 16 N.E.3d at 413-15 (summary judgment proper for insured where policy terms susceptible to more than one reasonable interpretation). Accordingly, Mallers' Expediting Expense Motion, R. 72, is granted.

## II. Mallers' Estoppel Motion and Great American's Policy-Based Cross Motion

In its Estoppel Motion, Mallers seeks summary judgment on its affirmative defenses of estoppel and/or waiver as to the following groups of expenses: (1) expediting costs (estoppel); (2) abated rent in the swing spaces (estoppel); (3) a centralized air conditioning system (estoppel and waiver); (4) certain damaged basement components (estoppel and waiver); and (5) damaged flooring (estoppel and waiver). Great American's Policy-Based Cross Motion seeks summary judgment as to two of the same expense categories—that is, concerning the basement components and flooring—arguing that neither is covered under the Policy. The Court considers the parties' arguments on each category after reviewing Illinois law on estoppel and waiver.

"In the context of insurance law, the doctrines of 'waiver' and 'estoppel' are closely akin and may often coexist. However, waiver and estoppel are two separate and distinct doctrines." *Ill. Ins. Guar. Fund v. Nwidor*, 105 N.E.3d 1035, 1043 (Ill.

App. Ct. 2018). Indeed, whereas "[w]aiver focuses exclusively on the conduct of the insurer, . . . estoppel focuses on the conduct of the insured in response to representations made by the insurer." *Lumbermen's Mut. Cas. Co. v. Sykes*, 890 N.E.2d 1086, 1097 (Ill. App. Ct. 2008) (citing *Twin City Fire Ins. Co. v. Old World Trading Co.,* 639 N.E.2d 584, 591 (Ill. App. Ct. 1993)).

To establish estoppel, the insured must show that "(1) the acts or statements of the insurer or its agent misled [it], (2) [it] relied on those representations, (3) [its] reliance was reasonable, and (4) [it] suffered detriment or prejudice because of [its] reliance." *Safeway Ins. Co. v. Ebijimi*, 117 N.E.3d 1227, 1239 (Ill. App. Ct. 2018) (citing *Chatham Corp. v. Dann Ins.*, 812 N.E.2d 483, 495 (Ill. App. Ct. 2004)). The insured need not show that the insurer intended to mislead it. *Id.*

In contrast, waiver "consists of either an express or implied voluntary and intentional relinquishment of a known right" that is "essentially unilateral in character." *Chatham Corp.*, 812 N.E.2d at 494. It focuses on "an insurer's conduct, and requir[es] no prejudice to, nor detrimental reliance by, an insured." *Id.*

The burden of establishing both estoppel and waiver rests with the insured, who must prove it by clear, precise, and unequivocal evidence. *Ankus v. Gov't Employees Ins. Co.*, 674 N.E.2d 865, 868 (Ill. App. Ct. 1996) (estoppel); *Moreno v. Joe Perillo Pontiac, Inc.*, 445 N.E.2d 1184, 1188 (Ill. App. Ct. 1983) (waiver). As such, estoppel and waiver are usually "left to the trier of fact where the material facts are in dispute or where reasonable people might draw different conclusions from the

evidence." *Lumbermen's Mut. Cas. Co. v. Sykes*, 890 N.E.2d 1086, 1098 (Ill. 2008). Mallers' motion fails under these standards as explained below.

### A.    Expediting Expenses

At the outset, Mallers argues that Great American should be estopped from denying coverage of the expenses incurred to restore the damaged property on floors 2-4 within 120 days, because Great American previously led Mallers to believe that such expenses were covered. In support, Mallers relies heavily on the testimony of Solotorovsky, which, as outlined above, was that Pawlak agreed at a meeting on April 30, 2018 that Great American would cover the costs of completing reconstruction within the 120-day deadline set forth in Mallers' tenants' leases, along with the costs of constructing swing spaces for the displaced tenants' use during the interim period. But because Mallers' estoppel argument is essentially in the alternative to its Policy-based claim with respect to the same expenses and the Court granted Mallers' Expediting Expense Motion as to those expenses *supra*, it need not also resolve Mallers' estoppel claim on those same costs.[9]

### B.    Abated Rent

Mallers next contends that Great American should be estopped from denying coverage for rent abatement for the displaced tenants. There is no dispute that rent abatement was discussed at the April 26 and 30 meetings between Solotorovsky and

---

[9] Even if the Court considered the merits of Mallers' Estoppel Motion as to the so-called expediting expenses, it would deny it, because as outlined above in Section I(A) and below in Section II(B), factual disputes remain regarding whether Pawlak ever agreed to cover those expenses.

Pawlak. But once again the parties differ on whether Great American agreed to cover those expenses, and if so, to what extent. Mallers argues that Pawlak agreed on behalf of Great American to abate rent for displaced tenants in swing spaces until reconstruction of floors 2-4 was complete, again offering as support Solotorovsky's testimony regarding his April 26 and 30 meetings with Pawlak.

But Great American disputes this with (among other things) Pawlak's affidavit, which indicates that "Mallers neither sought nor received my approval for this decision." R. 93-1 ¶ 20. As noted above, Mallers moved to strike Pawlak's affidavit as inconsistent with his deposition testimony, faulting Pawlak for offering little information about these topics during his deposition regarding the April 26 and 30, 2018 meetings with Solotorovsky. In particular (and among other things), Mallers points out that during his deposition, "both before and after reviewing his notes," Pawlak "unequivocally stated he had no recollection of discussing the leases or reviewing them." R. 111 at 9. According to Mallers, then, "[w]ith no recollection of reviewing or discussing the leases, Pawlak clearly had no recollection of the Insureds' requesting him to approve of an election under the leases," so his affidavit indicating that "[d]uring . . . discussions on April 30, 2018, I was never asked . . . to either approve of or object to any election that Mallers planned to make under their form leases" must be a sham. R. 113 at 4.

But as stated, a change in testimony due to a "lapse in memory" typically affects "only its credibility, not its admissibility." *McCann*, 622 F.3d at 751. And while Mallers leans on the fact that Pawlak was ultimately provided the same documents

at his deposition that he now claims refreshed his recollection for purposes of his affidavit, the Court does not find that dispositive, either. Given the fast-moving and multifaceted context in which the discussions at issue arose, it is plausible that Pawlak's memory was refreshed after reviewing these documents in a non-adversarial setting at a later date, and with more time to process the information. *See Castro*, 786 F.3d at 571 (a plausible explanation can overcome the finding of a sham affidavit). Moreover, the documents Pawlak points to as having relied upon are not inconsistent with the representations made in his affidavit. *See generally* R. 127-1. Accordingly, the Court declines to strike Pawlak's affidavit, and as such leaves both Pawlak's credibility, and Mallers' estoppel claim on rent abatement, to any jury in this case. *See Ankus*, 674 N.E.2d at 868 (insured must prove estoppel "by clear, concise, and unequivocal evidence."). Mallers' Estoppel Motion is denied as to rent abatement.

### C. Air Conditioning System

Prior to the fire, floors 2-4 of the Mallers Building contained a combination of individual window and split-system air conditioning units (together, "Individual A/C Units"). Those units were removed and demolished as part of the reconstruction efforts. But rather than replace them with similar units, Mallers ultimately installed a central air conditioning system, having determined that doing so was necessary to comply with Chicago's building code. Mallers and Great American went back and forth for months on whether the air conditioning system was covered under the Policy, and Mallers was insulted by several of Great American's proposed solutions.

Ultimately, however, Great American concluded that Coverage C of the Policy's Ordinance or Law provision applied (discussed further in Section III below), and covered the cost of the system up to Coverage C's $1 million sublimit.

Mallers nevertheless argues that it is entitled to summary judgment on its estoppel and waiver affirmative defenses as to the costs incurred in connection with the centralized air conditioning system, citing evidence that Great American delayed in approving it.

*Estoppel.* As to estoppel, and in addition to pointing out that it already paid the majority of Mallers' claim, Great American argues correctly that the detrimental reliance element "is obviously missing," because the Individual A/C Units were "rendered obsolete" by Chicago's building code, and therefore that code was at least part of Mallers' motivation for installing a centralized system. R. 87 at 13. Summary judgment is not warranted on these facts. *See Baker v. Baker*, 549 N.E.2d 954, 958 (Ill. App. Ct. 1990) (no equitable estoppel based on ex-wife's alleged agreement that ex-husband no longer had to pay child support because he still was obligated to pay under divorce decree).[10]

---

[10] Great American argues that Mallers' estoppel claim also fails because Mallers was on notice that the applicable Coverage C limit was $1 million, and estoppel cannot be used to "increase coverage provided under an insurance policy." *See* R. 87 at 13 (citing *Nationwide Mut. Ins. Co. v. Filos*, 673 N.E.2d 1099, 1103 (Ill. App. Ct. 1996)). The Court addresses Great American's interpretation of this aspect of the Policy in the context of the parties' code-related motions in Section III below, but notes here that "Illinois recognizes . . . [that] equitable estoppel . . . can force an insurer to do what general estoppel cannot: pay for a claim that falls outside the terms of the insurance policy." *Essex*, 927 F.3d at 1012-13.

***Waiver.*** Mallers also fails to demonstrate that summary judgment is proper based on waiver. Indeed, and despite Great American's delay in approving partial coverage of the air conditioning system, the record is clear that the parties continued to debate the issue throughout that time. *See* R. 71 ¶¶ 60-71 and R. 95 ¶¶ 60-71 (reflecting back and forth between Mallers and Great American regarding air conditioning system, including requests by Great American for more information about the same). A reasonable jury could conclude on these facts that Great American's delay was because of its lengthy investigation, not a desire to waive its rights. *See Ill. State Bar Ass'n Mut. Ins. Co. v. Coregis Ins. Co.*, 821 N.E.2d 706, 719 (Ill. App. Ct. 2004) (no waiver despite that insurer waited over a year to assert its right to rescind the policy because insurer did nothing in the interim to indicate that it was waiving its right); *see also Nat'l Tea Co. v. Comm. and Indus. Ins. Co.*, 456 N.E.2d 206, 213 (Ill. App. Ct. 1983) ("where waiver is implied from conduct, the act relied upon must be clear, unequivocal and decisive"). Accordingly, summary judgment is not proper for Mallers on either equitable ground as to the central air conditioning system.

### D.   Basement Components

Mallers seeks to recover the $86,845 it spent replacing exhaust fans, an air compressor, and water heaters located in the Mallers' Building basement (together, the "Basement Components"). As discussed, Mallers asserts a claim for coverage under the Policy, and in equity under the doctrines of estoppel and waiver. Great American moves for summary judgment on Mallers' claim under the Policy, while

Mallers moves as to estoppel and waiver. The Court takes these issues in turn below, beginning with Policy coverage.

**Policy coverage.** Great American contends that summary judgment is proper on Mallers' claim for coverage under the Policy because Mallers has not met its burden to establish that the Basement Components were damaged in the fire. Great American argues that Mallers knows this and sought recovery based on estoppel and waiver because of it.

In Illinois, the initial burden lies with an insured "to prove that its asserted loss was a covered loss under the terms of the insurance policy." *Old Second Nat. Bank v. Ind. Ins. Co.*, 29 N.E.3d 1168, 1176 (Ill. App. Ct. 2015). To do so here, Mallers points to: (1) statements Pawlak made in a May 3, 2018 report to Great American; (2) the fact that Mallers uploaded proposals for replacement of the Basement Components to Quantum's virtual data room on May 25, 2018; and (3) statements Buckley, the independent adjuster, made to Mallers on July 2 and 9, 2018. But none suffices—alone or in combination—to satisfy Mallers' burden.

First, the generic statements in Pawlak's May 2, 2018 report that there was "water damage to the three story subterranean basements" and "major smoke, water and fire damage to floors 4, 3, 2, 1 and three sub terrain basements" in no way proves that the specific Basement Components at issue were impacted by that (or any other) smoke, water and/or fire. Indeed, "[i]t is not enough to show that a loss *may* have occurred. [Mallers] must prove the nature, extent or amount of [its] loss to a reasonable degree of certainty before any award of damages can be made under the

[P]olicy." *Harbor House Condo. Ass'n v. Mass. Bay Ins. Co.*, 915 F.2d 316, 318 (7th Cir. 1990). It has not. The record reflects that the Mallers Building basement is three levels, and that Pawlak's report was completed only as a preliminary matter just days after the fire and weeks before the parties' experts completed their own investigation of the basement. *See generally* R. 71-6 at 5-19 (Pawlak's May 2, 2018 report indicating that it contains only "preliminary loss information" and lacking any detail about damage to basements); *see also* R. 91-4 (declaration of Great American's independent construction consultant and exhibits thereto describing basement investigation). As such, Pawlak's vague statements do not even suffice to create a genuine issue for trial. *See Harbor House Condo. Ass'n v. Mass. Bay Ins. Co.*, 703 F. Supp. 1313, (N.D. Ill. 1988) (granting summary judgment for insurance company where the policyholder offered only speculative evidence that damage was due to a covered event).

Nor does the fact that Mallers uploaded proposals for replacement; the issue is not whether the Basement Components needed replacing or what replacement would cost, but rather whether that need was due to a covered event for which Great American is responsible under the Policy.

That leaves Buckley's statements in July 2018. Solotorovsky attests that during a phone call on July 2, Buckley: "confirmed that coverage existed for replacement of the Damaged Basement Components;" "memorialized this confirmation in a document that he emailed to [Solotorovsky] after the phone call;" and sent a second email a week later further confirming that Great American had agreed to provide coverage. R. 70 at 13-14; R. 113 at 10-11. Those communications

31

are discussed in further detail below in the context of the Court's estoppel analysis. But it is sufficient for the resolution of the coverage issue to know that: (1) Great American offers evidence to refute that it ever approved coverage and in fact ultimately denied Mallers' claim for failure to demonstrate that the Basement Components were damaged in the fire; and (2) according to Great American's construction consultant, Mallers' consultant agreed after a joint inspection that several of the components at issue were not located in an area of the basement that was affected by the fire.[11] *See* 91-4 ¶¶ 5-10.

Even viewed in the light most favorable to Mallers, Mallers has not presented sufficient evidence to allow a reasonable jury to find that the Basement Components were damaged in the fire or fire-fighting efforts. Accordingly, summary judgment is proper for Great American on Mallers' claim for coverage.

***Estoppel.*** In support of its estoppel argument and as alluded to above, Mallers offers Solotorovsky's declaration, in which he attests that Buckley "confirmed that coverage existed" as to the Basement Components on two separate occasions in July 2018. Affixed to Solotorovsky's declaration are emails from Buckley that supposedly evidence that agreement. R. 70 at 13-14. The first, from July 2, 2018, states in relevant part:

Mechanical items for basement as included in claim submission # 1

---

[11] Notably, Mallers objects to this on the basis that what its consultant said amounts to inadmissible hearsay. Not so. Indeed, such a statement is admissible as an admission by the agent of a party opponent under Federal Rule of Evidence 801(d)(2)(D). Moreover, Mallers fails to refute this evidence with any of its own.

Following items have since been agreed to as to costs for invoicing and will be include in next payment request along with claim submission # 2 (not current payment request pending with GAIG)

> ➢ Committed Items –
>   # 9 – P&M Mercury - $19,512.00
>   #10 – P&M Mercury - $22,880.00
>   #11 – P&M Mercury - $48,015.00
>   #12 – P&M Mercury - $4,980.00

R. 71-14 at 42. The second email, from July 9, 2018, states (among other things), "Additional agreements achieved after payment request – submission #1," and includes an attachment entitled "Claim Submission #1 – Disputed items resolved post payment request." *Id.* at 44, 47. The attachment mirrors the "Committed Items" list set forth in Buckley's July 2 email, and indicates that those items and amounts were "*Agreed.*" *Id.* at 47.

But an October 3, 2018 email from Buckley to Solotorovsky included a spreadsheet reflecting that the same items were not agreed to in terms of coverage. *See id.* at 51 (indicating as to the air compressor, "Backup documentation requested/not provided to MKA;" as to the water heaters, "not loss related – replacement water heaters in B-3;" and as to the exhaust fans, "Under Review M&E pending document request"). Solotorovsky responded by email on October 29, stating that Mallers had incurred expenses in reliance upon Buckley's July 2018 emails, and asking Buckley to "update these items as agreed in light of the previous agreement communicated." *Id.* at 54.

Buckley's November 2 email response stated:

We did indeed agree to those items when initially presented . . . albeit in error, as the claim was developing/evolving within our investigation. As referenced in prior communications by Great American, the claim, as

it continues to evolve, is being investigated by GA who has reserved their rights consistent with the terms and conditions of the involved policy. The continued evolving and ever changing claim submissions, as well as the preliminary Statement('s)s of Loss and our evaluations are preliminary as our investigation continues.

As I mentioned in our prior conference call when you raised this issue before, during our review of claim submission #3, upon closer look at several items including these referenced, it was made clear to us by our experts that these items were not damaged from the claimed event. The experts acknowledged the spreadsheet errors, however remained confidant [sic] in their opinions that these items were not required to be replaced as a result of damage from the claimed event.

If you are now claiming that these items were damaged and required replacement as a result of the claimed event, please specify how they were damaged requiring replacement and who made this determination and that person's contact information.

If you maintain these items required replacement as a result of the claimed event and can provide the requested details, I will present this information and or documentation to GA for further reconsideration.

*Id.* at 53. Buckley also testified at his deposition that:

> . . . [Mallers] brought up several invoices for items in the basement. I believe it was some compressors and some water heaters, and they contacted me personally and not our consultants that were dealing with this and said essentially -- and I don't remember exact conversation -- Jim, we need to get these things approved. The – are you okay with these invoices for a compressor, a water heater, and so forth? I said, the numbers look fine.
> . . .
> Sometime thereafter, the insured read our notes and said, Jim, you took these out, why? I said, I'm glad you brought that up. I did agree to those things, but I'm now told that they're not loss related. Can you tell me if they're loss related? And if you can, then I'm happy to re-present them to Great American. So tell me the particulars of why they're loss related because here's what our consultants are saying.

R. 71-11 at 142-145. Solotorovsky did not respond to this request. Mallers argues that

Buckley's actions amounted to an about-face from which it was prejudiced.

But Great American offers Buckley's declaration indicating that he never "confirmed coverage" as Mallers represents; rather, he simply approved the *costs* for the replacement items, relying on Mallers' assurances immediately after the fire that the Basement Components "needed to be replaced due to damage caused by the fire." R. 88-33 ¶ 12. Buckley continues that when Great American later determined for itself that the Basement Components were not damaged by the fire or fire-fighting efforts, it communicated this to Mallers, inviting it to present evidence to the contrary. *Id.* ¶¶ 13-14. Buckley attests (and Mallers does not dispute) that Mallers did not do so. *Id.* ¶ 14. Great American argues that Mallers' equitable claims are therefore barred under the doctrine of unclean hands.[12] *See Gen. Elec. Bus. Fin. Servs., Inc. v. Silverman*, 693 F. Supp. 2d 796, 804 (N.D. Ill. 2010) ("Under Illinois law, the unclean hands doctrine prevents a party from obtaining equitable relief if he himself has engaged in misconduct.") (citing *Thomson Learning, Inc. v. Olympia Props., LLC*, 850 N.E.2d 314, 325 (Ill. App. Ct. 2006)).

In response, Mallers contends that Buckley's declaration is inconsistent with his deposition testimony and should be disregarded. But the Court disagrees. Indeed, Buckley testified consistent with his declaration that during a telephone call with Mallers representatives regarding the Basement Components, Buckley told Mallers: "the numbers look fine" *assuming "they were loss related*;" his approval of the costs

---

[12] Great American also contends that the detrimental reliance element is lacking because Mallers would have replaced the Basement Components regardless of whether Buckley "confirmed coverage." R. 87 at 13. But Great American cites no evidence in support of this contention, so the Court declines to consider it.

"was done in haste" because Mallers was "pressing" him and "needed a decision quickly;" and he "assumed the insured would not present something that [was] not loss related." R. 93-9 at 143-44, 146-48 (emphasis added).

Accordingly, issues of material fact remain concerning what (if anything) was promised, and whether any such promise was made based on Mallers' misrepresentations. Mallers' motion is therefore denied as to the Basement Components.

***Waiver.*** Mallers' motion faces the same fate with respect to waiver, which "[u]nlike equitable estoppel, . . . 'may not be used to create or extend policy coverage where none exists.'" *See Essex Ins. Co. v. Blue Moon Lofts Condo. Ass'n*, 927 F.3d 1007, 1015 (7th Cir. 2019) (quoting *Lytle v. Country Mut. Ins. Co.*, 41 N.E.3d 657, 663 (Ill. App. Ct. 2015)). Having concluded that judgment is proper for Great American on the issue of coverage, Mallers' motion is necessarily denied as to waiver.

### E. Damaged Flooring

Before the fire, there were two layers of flooring in the corridors of floors 2-4: a ceramic tile layer and an original porcelain tile layer underneath. The former was damaged in the fire. After the fire, Mallers elected to remove and dispose of the damaged ceramic layer and restore the porcelain layer, and Great American reimbursed Mallers for the associated costs. But Mallers contends that it would have cost an additional $106,000 above and beyond what it already spent to restore the ceramic layer, and that Great American must pay that amount, too, in order to make Mallers whole as the Policy's replacement cost coverage requires.

Great American seeks summary judgment on Mallers' claim for coverage of that $106,000 under the Policy, R. 89, while Mallers seeks summary judgment as to the same amount based on waiver, R. 69. As stated, waiver cannot create or extend coverage, so the Court begins with the coverage dispute. *See Jordan Mozer & Assocs., Ltd. v. Gen. Cas. Co. of Wis.*, 2015 WL 1911119, at *3 (N.D. Ill. Apr. 24, 2015) (waiver "cannot be used to create primary liability or to increase coverage provided under an insurance policy") (quoting *Nationwide Mut. Ins. Co. v. Filos*, 673 N.E.2d 1099, 1103 (Ill. App. Ct. 1996)).

***Policy coverage.*** Great American argues that summary judgment is proper because it already paid to dispose of the ceramic tile and restore the porcelain layer underneath, and because the Policy does not require it to also pay the additional $106,000 that Mallers would have incurred over and above what it spent to do this had it instead elected to repair the ceramic tile flooring. Great American points to the Policy's "Valuation" provision in support, which provides in relevant part that:

i. We will not pay on a replacement cost basis for any loss or damage

(1) until the lost or damaged property is actually repaired or replaced; and

(2) unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

j. We will not pay more for loss or damage on a replacement cost basis than the least of (1), (2) or (3) subject to k. below:

(1) the Limit of Insurance applicable to the lost or damaged property;

(2) the cost to replace the lost or damaged property with other property:

(a) of comparable material and quality, and

(b) used for the same purpose; or

> (3) *the amount actually spent that is necessary to repair or replace the lost or damaged property*.

R. 9-1 at 40-41 (emphasis added). Great American contends that subsection j(3) caps coverage at what has already been paid.

But Mallers argues that the Valuation provision must be read with the Policy's "Loss Payment" provision, which states in relevant part:

> 1. In the event of direct physical loss or damage covered by this Coverage Part, at our option, we will either:
>
>> (a) pay the value of lost or damaged property;
>>
>> (b) pay the cost of repairing or replacing the lost or damaged property;
>>
>> (c) take all or any part of the property at an agreed or appraised value; or
>>
>> (d) repair, rebuild or replace the property with other property of like kind and quality.

R. 9-1 at 37. Mallers cites *Windridge of Naperville Condominium Association v. Philadelphia Indemnity Insurance Company* for the proposition that although only the "fourth option [of the Loss Payment provision] includes the phrase 'like kind and quality,' the valuation provision applies to all four choices—meaning that, regardless of which option [Great American] chooses, replacement property must be '[o]f comparable material and quality'" to truly make it whole. R. 115 at 7 (citing 932 F.3d 1035, 1039 n.3 (7th Cir. 2019)). Mallers further contends that reimbursement for polishing the porcelain underlay and disposing of the ceramic tile did not make it whole, because doing so did not "approximate the situation [it] would have occupied had the fire not occurred"—that is, by restoring the *ceramic* flooring to its pre-fire state. R. 115 at 7.

While *Windridge* involved similar contractual language, that case did not concern an express cap on recovery at what was actually spent. Nor did it concern an insured's choice to spend less, not more on a replacement. And its facts are easily distinguishable. Indeed, the issue in *Windridge* was whether the insurer was required to replace all of the siding on a building to ensure "matching" where the original siding was no longer available for purchase, or only those portions that were actually damaged. *See Windridge*, 932 F.3d at 1038. Ultimately, the court held that the policy was ambiguous, and, construing it in favor of coverage as it must, that mismatched siding would not put the insured back in the position it was in before the storm, and thus would not make it "whole." *Id.* at 1042.

There is no reasonable argument that polished porcelain versus ceramic floor is akin to mismatched siding. And unlike in *Windridge*, here, it was the insured's choice to proceed with the less costly replacement. Courts have denied insureds additional payment for hypothetical, more costly options not chosen on similar policy language and facts, even where the policy did not expressly cap recovery on the amount spent. *See Park Ctr. III Ltd. P'ship v. Penn. Mfrs. Ass'n*, 30 F. App'x 64, 74 (4th Cir. 2002) (holding under similar policy language that the insured was entitled "to only what it actually spent" despite lack of explicit cap, and that while the insured is "entitled [under the policy] to be reimbursed for placing itself in the same position it was in prior to [Hurricane] Floyd," to the extent it did not do so, it was "solely of its own choosing."). To be sure and as set forth above, section i(1) of the Valuation provision conditions payment on completion of the repair. And the only purpose the

Court can fathom for such a provision would be to prevent a policyholder from collecting the costs to fully replace its property but then spend only part of the money on the replacement. In short, to prevent a windfall. *See id.* at 73 ("The only purpose of [the] provision [conditioning payment on completion of actual repair or rebuilding] is . . . to prevent an insured from collecting the costs to fully replace its property, spending only part of that money on a cheaper form of replacement, and then pocketing the net."); *see also Hampton v. Safeco Ins. Co. of Am.*, 614 F. App'x 321, 324 (6th Cir. 2015) (provision "unambiguously limit[ing] recovery to costs actually incurred" does not "permit plaintiffs to purchase a less expensive home and then claim the difference between that replacement house and the estimated rebuilding price in cash").

Mallers also has not argued that restoring the bottom layer of flooring (versus the hypothetical restoration of the top layer) somehow diminished the value of the flooring. In fact, the Court assumes Mallers concluded that the opposite was true: that is, that the porcelain flooring was at least equivalent, if not preferable, to the ceramic flooring. Otherwise, why choose that option?

In sum, the restored tile flooring puts Mallers is in a comparable position to that in which it sat pre-fire. Accordingly, and because Great American has reimbursed Mallers for the costs associated with the steps it *did* elect to take with respect to the flooring, Great American's motion for summary judgment as to Mallers' claim for coverage of the damaged flooring is granted.

**Waiver.** As stated, Mallers also is pursuing the $106,000 hypothetical cost difference via waiver and moves for summary judgment on that basis. In support, Mallers offers evidence it says demonstrates that Great American outright ignored its claim, and that its "failure to provide a coverage decision is 'inconsistent with any intention other than to waive' its right to deny coverage." R. 70 at 14-15 (citing *Home Ins. Co. v. Cinn. Ins. Co.*, 821 N.E.2d 269, 282 (Ill. 2004)). But again, waiver cannot be used "to create or extend coverage where none exists." *Essex Ins. Co.*, 927 F.3d at 1015. And the Court concluded above that there is no coverage for the hypothetical cost of replacing the ceramic tile flooring Mallers seeks. Accordingly, summary judgment for Mallers is denied on this issue.

*     *     *     *     *

Accordingly, Mallers' Estoppel Motion, R. 69, is denied, and Great American's Policy-Based Cross Motion, R. 89, is granted.

## III.    Code-Related Motions

Both Great American's Code-Related Motion and Mallers' Code-Related Cross Motion seek summary judgment as to: (1) Mallers' counterclaim for the replacement cost value of the Individual A/C Units; and (2) Great American's Count III concerning costs related to overhead sprinkler installation. Great American's motion also seeks summary judgment as to its Count III concerning costs associated with elevator shaft walls. The Court considers these issues in turn after setting forth the applicable Policy provisions.[13]

---

[13] Great American also moved for summary judgment on Mallers' claims for the loss of rents for four non-renewing tenants, and for seven vacant spaces that were

## A.    Applicable Policy Provisions

The Policy's "Ordinance or Law" provision states in relevant part:

## I. Optional Coverages

***

## 2. Ordinance or Law

**a. Each of the Coverages** – Coverage A, Coverage B and Coverage C – applies only if that Coverage(s) is chosen by entry in the Declarations and then only with respect to the Building property identified for that Coverage(s) in the Declarations.

**b. Application of Coverage**

The coverage provided by this Optional Coverage applies only if both (1) and (2) are satisfied and then subject to the qualifications set forth in (3).

**(1)** The ordinance or law:

**(a)** Regulates the demolition, construction or repair of buildings, or establishes zoning or land use requirements at the described location; and

**(b)** is in force at the time of loss.

But coverage under this Optional Coverage applies only in response to the minimum requirements of the ordinance or law. Losses and costs incurred in complying with recommended actions or standards that exceed actual requirements are not covered under this Optional Coverage.

**(2)** **(a)** the building sustains direct physical damage that is covered under the policy and such damage results in enforcement of the ordinance or law;

***

**d. Coverage**

**(1) Coverage A - Coverage for Loss to the Undamaged Portion of the Building**

With respect to the building that has sustained covered direct physical damage, we will pay under Coverage **A** for the loss in value of the undamaged portion of the building as a consequence of enforcement of or compliance with any ordinance or law that

---

renovated for use as swing spaces by displaced tenants. But the parties have since settled those claims, so the Court does not consider those arguments here.

requires demolition of undamaged parts of the same building. Coverage **A** is included within the Limit of Insurance shown in the Declarations as applicable to the covered building. Coverage **A** does not increase the Limit of Insurance.

**(2) Coverage B - Demolition Cost Coverage**

With respect to the building that has sustained covered direct physical damage, we will pay the cost to demolish and clear the site of undamaged parts of the same building, as a consequence of enforcement of any ordinance or law that requires demolition of such undamaged property. If attached, the Coinsurance Additional Condition Endorsement does not apply to Demolition Cost Coverage.

**(3) Coverage C – Increased Cost of Construction Coverage**

> **(a)** With respect to the building that has sustained covered direct physical damage, we will pay the increased cost to:

>> **(i)** repair or reconstruct damaged portions of that Building property; and/or

>> **(ii)** reconstruct or remodel undamaged portions of that Building property, whether or not demolition is required;

> when the increased cost is a consequence of enforcement of or compliance with the minimum requirements of the ordinance or law.

R. 9-1 at 62-64. Recovery under Coverage B and C is capped at $1 million each, while Coverage A is included in the $80,238,264 Building limit. *Id.* at 29.

## B.    Analysis of Code-Related Motions

***Individual A/C Units.*** Both Great American and Mallers move for summary judgment on Mallers' counterclaim for the replacement cost value of the Individual A/C Units. Mallers argues that the Individual A/C Units' $605,157 replacement cost value is payable under the Building limit, and only the difference between the cost of the central air conditioning system ($1.3 million) and that replacement cost value should be allocated to Coverage C. But Great American contends that the entire cost

of the central air conditioning system is payable under Coverage C, subject to its $1 million limit, and that it need not separately cover the replacement cost value of the Individual A/C Units because: (1) they were not "replaced" under the Policy and; (2) there is insufficient evidence that they were damaged in the fire.[14]

The Court turns first to the evidence that the Individual A/C Units were damaged in the fire.  To start, Mallers points to a complaint filed by the City of Chicago against Mallers alleging that the Individual A/C Units were "compromised and must be removed." R. 102 at 13. However, "mere allegations of a complaint are not evidence," so this does not save Mallers' claim. *Tibbs v. City of Chicago*, 469 F.3d 661, 663 n.2 (7th Cir. 2006); *see also Gen. Ins. Co. of Am. v. Clark Mall Corp.*, 2010 WL 2901788, at *5 (N.D. Ill. July 26, 2010) (for purposes of summary judgment, "[a]llegations in a complaint are not evidence").

Mallers next points out that none of the displaced tenants took their Individual A/C Units with them when they moved into swing spaces. But the Court agrees with Great American that "[s]peculation as to the tenants' undisclosed motivations" in deciding not to move the units "does not replace actual *evidence* of physical damage." R. 122 at 4 (emphasis in original).

Finally, Mallers points to the fact that Great American: (1) agreed shortly after the fire that the demolition of floors 2-4 was a "gut" job "down to the stud walls and the floors and ceiling finishes," excepting only the storefronts; and (2) that Great

---

[14] Initially, Great American also argued that no coverage existed for the Individual A/C Units because they belonged to the tenants, not Mallers. But Great American abandoned that argument in its reply brief, so the Court does not address it here.

American actually paid for the destruction of the Individual A/C Units. Great American does not dispute these facts, but argues that they are not enough, because Mallers cannot demonstrate that Great American specifically considered the Individual A/C Units in its analysis, or that Mallers or its agents evaluated the condition of the units at all. However, a reasonable jury could conclude based on Great American's actions alone that the units were damaged in the fire. And that Great American determined that the storefronts were salvageable suggests that it may have considered the salvageability of other property in the building too. Accordingly, a fact question remains on this issue for any jury in the case.

Great American also argues that coverage on a replacement cost basis is not warranted because the Individual A/C Units were not replaced within the meaning of the Policy, citing the difference between an individual unit that cools a single suite and the centralized multi-floor system that was installed. Great American further argues that Mallers would retain a windfall under its interpretation of the Policy. For its part, Mallers maintains that the central air conditioning system *is* a true "replacement" because it is "functionally similar" to the Individual A/C Units in that both provide air conditioning. *See* R. 107 at 13-14 (citing *Seeber v. General Fire & Cas. Co.*, 19 N.E.3d 402, 411 (Ind. App. Ct. 2014) and *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 445 F. Supp. 2d 320, 333 (S.D.N.Y. 2006)). Mallers also points

out that the Policy's Valuation provision does not require that a replacement be of comparable material and quality.[15]

But for all of Great American's argument about the lack of similarity between the central air conditioning system and Individual A/C Units, Great American fails to reconcile the fact that Mallers does not seek to recover the full cost of the central air conditioning system under the Building limit. Instead, as explained, Mallers seeks only to recover the replacement cost for the Individual A/C Units, and to recover the difference between that cost and the cost of the central air conditioning system under Coverage C. And that is precisely why ordinance or law coverage exists. *See Allen v. USAA Cas. Ins. Co.*, 790 F.3d 1274, 1276 (11th Cir. 2015) (noting that where ordinance or law coverage exists, "primary insurance coverage pays the cost to replace [the insured property], and [ordinance or law] coverage pays the additional cost required to upgrade to the [code compliant property]"). None of the cases Great American cites hold otherwise, or even address ordinance or law coverage. Accordingly, Great American's Code-Related Motion is denied on Mallers' counterclaim for the replacement cost value of the Individual A/C Units. But because a fact issue remains concerning whether the Individual A/C Units were damaged in the fire, Mallers' Code-Related Cross Motion on the same issue is denied as well.

**Sprinkler-related costs.** The facts underlying this claim are largely undisputed. Prior to the fire, the Mallers Building had an exposed overhead sprinkler

---

[15] As discussed in Section I above, Mallers takes the opposite position on this point with respect to the damaged flooring.

system in only its corridors and hallways. After the fire, Mallers was required to install the system throughout the remainder of the building to comply with Chicago's building code. As part of that project and among other things, Mallers' contractor: (1) created through-wall firestop penetrations[16] to connect the main system into each suite with a two-inch thick trunk line; (2) removed and replaced ceiling tiles in suites with drop ceilings as necessary to install the system; and (3) utilized floor protection (together, the "Sprinkler-Related Tasks").

Ultimately, Mallers' contractor charged $711,409 for the project, of which Mallers contends $208,207.50 is attributable to the Sprinkler-Related Tasks. Great American argues that the entire $711,409 is allocable to Coverage C (and subject to its $1 million sublimit) as representing the increased cost of construction incurred to comply with the City's mandate. But Mallers contends that the $208,207.50 attributable to the Sprinkler-Related Tasks instead represents demolition costs associated with code-compliant construction, and therefore falls under Coverage B's separate $1 million sublimit.

Both Great American and Mallers seek summary judgment on this claim. Great American argues that summary judgment in its favor is proper because: (1) as a matter of law, neither removing and replacing ceiling tiles nor creating penetrations in walls is "demolition"; and (2) Coverage B only applies to labor costs, which Mallers'

---

[16] A through-wall penetration is exactly as it sounds; that is, a hole made through a wall, usually to accommodate pipes or wires, or in this case, the water line of an indoor sprinkler system. A firestop is a seal around the pipes or lines that pass through a wall to prevent a fire from spreading through any opening that otherwise would be present.

contractor's invoices do not separately delineate. Great American also points out the lack of evidence that the floor protection was necessitated by the so-called "demolition," as opposed to the sprinkler installation itself.

For its part, Mallers argues that summary judgment in its favor is proper because Great American cannot prove that the costs associated with all Sprinkler-Related Tasks constitute construction under Coverage C, which it must since that limit has already been met. *See Addison Ins. Co.*, 905 N.E.2d at 752 (insurer bears burden of proving that a loss is limited or excluded). But for the reasons explained above, that issue is an open one. And the Court is not persuaded in any case.

Mallers first cites *20 E. 35 Owners Corporation v. Great American Insurance Company*, in which the insured replaced all the gas cocks on the building's gas lines in order to conduct code-required mercury pressure testing. 1996 WL 438172, at *1-2 (S.D.N.Y. Aug. 5, 1996). To do so, workers had to "tear into" and "repair" walls by "sheet rocking, plastering, painting and wallpapering." *Id.* at *2. The court concluded this work was "demolition" under the policy. *Id.* at *4. But *20 E. 35 Owners* is neither binding nor persuasive, especially in light of the "defendants' complete lack of argument about the proper interpretation" of the policy concerning demolition.[17] *Id.*

Mallers also points to the testimony of one of Great American's insurance adjusters and Rule 30(b)(6) witnesses in a case currently pending in the Eastern District of Pennsylvania, who stated that he believed that removal of a "6-by-6 piece of drywall to get behind the wall" was demolition. *See* R. 107 at 17 (citing R. 106-5).

---

[17] Further, neither ceiling tiles nor floor protection were at issue in that case.

But there can be no suggestion that cutting holes for a two-inch thick water line is equivalent to the larger scale drywall removal at issue in that case.[18]

Finally, Mallers argues that "[a]t the very least, the term 'demolition' is ambiguous," and that the ambiguity must be resolved in its favor. R. 107 at 10-11. But the Court does not perceive that to be the case on these facts, and for the same reason rejects Mallers' argument that Great American has not met its burden to demonstrate that the costs fall under Coverage C construction. The plain, ordinary and popular meaning of "demolish" is to "tear down," "raze," "break into pieces," or "destroy," none of which describes what transpired here. *See* Merriam-Webster Dictionary Online, *available at* www.merriam-webster.com/dictionary/demolish; *see also Crum & Forster*, 620 N.E.2d at 1078 (courts "will not search for ambiguity where there is none," and as such plain and unambiguous terms will be afforded their "plain, ordinary meaning"). Accordingly, Mallers motion is denied on this issue, and Great American's motion is granted.[19]

***Elevator shaft walls.*** Finally, Great American also moves for summary judgment on Mallers' claim regarding the elevator shaft walls on floors 2-4, which Mallers discovered during demolition did not comply with Chicago's building code, in that they did not provide at least two hours of fire resistance. Clune therefore installed three layers of drywall in the affected elevator shafts during reconstruction:

---

[18] And again, this testimony implicates neither ceiling tiles nor floor protection.

[19] Having resolved the claim on the Policy interpretation issue, the Court declines to also address Great American's argument concerning the alleged insufficiency of Mallers' evidence of the amount of loss attributable to the so-called demolition work.

an initial 5/8-inch-thick layer to replace the single layer that had been demolished; a second layer of the same thickness; and a third, one-inch thick layer enclosing the shafts. Great American categorized the second and third layers of drywall as subject to Coverage C, because the $142,065 incurred to construct them was necessary to comply with the Chicago Building Code. Mallers does not dispute this. But it contends that although Great American also paid the cost of installing the first layer of drywall, it still was not "made whole" under the Policy because it would have been more costly to install a lath and plaster wall—which was there pre-fire—than the drywall actually used, and that Great American should pay the difference between the two.

In other words, Mallers' argument precisely tracks its position with respect to the damaged flooring addressed *supra*. But for the reasons it failed there, it fails here too. *See Park Ctr. III Ltd. P'ship*, 30 F. App'x at 74 (insured was "entitled [under the policy] to be reimbursed for placing itself in the same position it was in prior to [Hurricane] Floyd," but to the extent it did not do so, it was "solely of its own choosing."). Further, even assuming the Valuation provision's cap on recovery at the amount spent alone does not foreclose Mallers' argument, the Loss Payment provision as interpreted by Mallers does. Mallers cannot reasonably argue that drywall is not comparable to lath and plaster. And other than to contend that lath and plaster is more expensive, and drywall is not identical, Mallers does not attempt it. "Comparable" is "similar" or "like," not identical. *See* Merriam-Webster Dictionary Online, *available at* https://www.merriam-webster.com/dictionary/comparable. That a less costly replacement was elected does not entitle Mallers to additional coverage.

Mallers was "made whole" with the drywall installation, and summary judgment is proper for Great American on the elevator wall claim.

*    *    *    *    *

In sum, Great American's Code-Related Motion, R. 80, is granted as to the Sprinkler-Related Tasks and elevator wall shaft issue, and denied as to the Individual A/C Units, and Mallers' Code-Related Cross Motion, R. 101, is denied in full.

## CONCLUSION

For the reasons stated, Mallers' Expediting Expense Motion, R. 72, is granted; Mallers' Estoppel Motion, R. 69, is denied; Great American's Policy-Based Cross Motion, R. 89, is granted; Great American's Code-Related Motion, R. 80, is granted in part and denied in part; and Mallers' Code-Related Cross Motion, R. 101, is denied.

ENTERED:

_____

Honorable Thomas M. Durkin
United States District Judge

Dated: May 26, 2021